NELLIE SHISLER, Appellant, v. CATHOLIC CEMETERY IMPROVEMENT ASSOCIATION OF FORT DODGE et al., Appellees.

JANUARY 8, 1929.

*G. Scott Davies, C. C. Putnam,* and *Guy S. Calkins,* for appellant.

*Frank Maher, Leslie Parry, Healy, Thomas & Healy,* and *Healy & Breen,* for appellees.

KINDIG, J.—There is presented here but one question. That involves the plaintiff-appellant's right to the specific performance of an indenture dated May 6, 1912, alleged to have been entered into by and between the New York Foundling Hospital and Catherine Hower, late of Fort Dodge. By its terms, the written undertaking purports that Catherine Hower agreed to adopt one Nellie Hower, or give and bequeath the latter, through

a will, "at least as large a part of the estate, real and personal, of the testator as she [Nellie] would have received if said testator had died intestate and said child had been the natural and legitimate child" (of) Mrs. Hower. More definitely, the controversy centers around the question as to whether or not such written agreement was ever executed by Mrs. Hower. Her signature purports to have been affixed by the use of a mark witnessed by one Clara Agnes Gleason (now Mrs. Kelley). For a better understanding of the issue offered for decision, the historical background is important.

Catherine Hower and her husband, Andrew Hower, lived at Fort Dodge, for many years, in the back part of a building on Central Avenue. The front portion thereof was occupied by Mr. Hower, to carry on the operations of a feed store. In the year 1910, the husband died. Thereafter, the feed business was conducted by Mrs. Hower. She died in the year 1925, at the uncertain age of 75 or 80 years. At the time of her death, Mrs. Hower owned property approximating the value of $60,000.

During many preceding years, this lady, frail and a partial invalid, required assistance when ascending and descending stairs, and when entering and alighting from vehicles. Possessing little education, she could not read or write, and necessarily, therefore, depended upon others for business advice, the explanation of written documents, and the placing of her own signature on checks, legal papers, written agreements, etc.

Mr. and Mrs. Hower had no children of their own, but during their married life, they took into their home three girls from the New York Foundling Hospital, of New York City. These children were never legally adopted. Two of them, however, Elizabeth and Irene, were taken from the hospital under respective contracts providing for conditions in the nature of an apprenticeship. Nellie Shisler, the appellant, apparently went into the Hower home without a written agreement. However, about 4 months before she became 18 years of age, the indenture here litigated is purported to have been executed.

Elizabeth is approximately 47 years of age, married, and has a family of children. When about 5 years old, she went to the Hower home, where she was raised. Irene died in 1909 or 1910. This was before the death of Mr. Hower. Appellant's original name was Nellie Campbell, and the date of her birth

appears to have been September 9, 1894. Sometime during the month of July, 1899, she was placed in the Hower home, as before stated. It, was the practice and custom of the New York Hospital, at the time these girls were thus located in the Hower home, to demand a contract. Those written agreements did not contain Paragraph VIII, which is embodied within the present indenture. Said paragraph is as follows:

"VIII. And the parties of the second part further agree, that, if said child be not returned to the party of the first part [the New York Foundling Hospital] when she attains her legal majority, or shall not have been so returned before she shall have attained such age, and this agreement of indenture be duly cancelled and annulled by the consent of both parties; or if said child be not legally adopted by said parties of the second part [Andrew Hower and Catherine Hower] before said child attain such age, then the parties of the second part, in consideration of this indenture and of being permitted by the party of the first part to keep such child, shall be deemed to have elected to keep, treat, and maintain said child as if it were their own natural and legitimate child. And the parties of the second part further agree that, if the parties of the second part shall die intestate, said child shall inherit and succeed to such share of the property, real and personal, of which the parties die seized and possessed, as would have descended or would have been distributed to said child if she had been the natural and legitimate child of the parties of the second part; and that if the parties of the second part shall die leaving a last will and testament, such will shall contain a provision or provisions, giving, bequeathing and devising to said child at least as large a share of the estate, real and personal, of the testator, as she would have received if said testator had died intestate and said child had been the natural and legitimate child of the parties of the second part."

So, if Mr. and Mrs. Hower had executed an agreement with the hospital for Nellie, the appellant, at the time she was "placed" with her foster parents, in July, 1899, there would have been no provision embraced therein concerning inheritance or the making of a will, as set forth in Paragraph VIII, supra. No such stipulation was in the agreement relating to Elizabeth

or Irene. That condition concerning inheritance and the making of a will was devised and incorporated at a later date, and accordingly appeared in the indenture agreements used by the hospital May 6, 1912, when the instrument in controversy is alleged to have been executed.

Facts leading up to the alleged making of this indenture are important at this place. Mrs. Shisler, the appellant, proved to be a disobedient child in the Hower home. The foster parents could not control her, and she became more and more wayward. A traveling representative for the New York Hospital visited Fort Dodge, saw the situation, and reported back to the institution that appellant had gotten beyond the control of these old people, and should be placed in the Home of the Good Shepherd, at Sioux City, an institution for "delinquent and preservate children." Similar recommendations were made by others, including Edmund Heelan, then the pastor of the Sacred Heart Church of Fort Dodge, now bishop of the Sioux City diocese. Accordingly, the foster parents placed this child in the Home of the Good Shepherd, where she remained for about 3 years, or from the age of 14 to that of 17. Then appellant left the institution, and her method of departure is described by her own words, as follows:

"I ran away from the Home. I walked the railroad track about seven miles. I asked a party to let me sleep there over night, which they did. From the Good Shepherd Home I went straight home to Fort Dodge, and after returning to Fort Dodge, in November, 1911, I stayed there. After I arrived here [Fort Dodge], in November, 1911, I was here continuously up until I was 18 years old. I stayed at home until I was married, and afterwards."

After appellant returned to Fort Dodge, she boarded and lodged at Mrs. Hower's, but worked at an overall and shoe factory until her marriage, in October, 1915, to R. K. Shisler.

About the month of February, 1911, while appellant was at the Home of the Good Shepherd, in Sioux City, she met Clara Agnes Gleason, now Mrs. Kelley, who, as before mentioned, afterwards is alleged to have witnessed the mark of Mrs. Hower to the indenture involved in the case at bar. These girls became friends, and have continued such ever since. Clara Agnes

310

Gleason also ran away from the Home of the Good Shepherd, and went to Fort Dodge, where she lived with appellant in the Hower home for a considerable length of time. Subsequently, Clara Agnes Gleason (Kelley) married one Kelley, and afterwards was divorced; but she retained her husband's name, and now resides in Chicago.

Further and more specific facts leading up to the alleged execution of the indenture are these: One M. J. McFeely, in the year 1912, was traveling in Iowa as a representative of the New York Foundling Hospital. Generally speaking, it was his duty to place orphans in homes and to visit them thereafter. Wherefore, on May 3d of that year, he called at the Hower home in Fort Dodge, where he apparently discovered that there was no contract in appellant's behalf entered into between the foster parents and the New York Hospital. Hence, on May 3, 1912, he wrote the hospital this letter:

"Dear Sister: There is a family named Hower in Fort Dodge who has raised three of our girls. One is married well, one dead, and the other, who is now 18 years, is still with the mother who is old, but rich. She has no adoption papers. Please send them to her at once or our girls may lose all. I go to Omaha tomorrow. Very respectfully yours, M. J. McFeely."

Apparently the letter was mailed from Livermore, Iowa. Following the receipt of said communication, the New York Hospital authorities duly executed the indenture now in question in duplicate (it is claimed by appellant that this was done in triplicate), and thus mailed it to Mr. and Mrs. Hower (appellant claims it was brought there by Mr. McFeely) for their signatures. Somehow, appellant obtained the possession of these papers, and wrote the hospital at New York that Mr. Hower had died. Her inquiry, therefore, was as to whether or not the contract would be legal if executed by Mrs. Hower alone. Whether or not appellant's letter was ever answered does not appear. Records at the New York hospital show that neither of these indenture agreements was ever returned to it. But after Mrs. Hower's death, and her will was filed for probate, two copies of the New York hospital contract appeared in the possession of appellant and her husband. Both copies then purported to have been executed by Mrs. Hower.

December 8, 1920, Catherine Hower made her last will and testament, through which she disposed of her estate. Of this she gave: First $20,000 to Elizabeth Allen, her foster daughter; second, $300 in trust for the three children of said Elizabeth Allen; third, small gifts to relatives; and fourth, the balance to various churches and benevolent associations. Nothing was given to the appellant, but Paragraph 13 of the will refers to her in the ensuing language:

"13. I have heretofore made a deed to my foster daughter, Nellie Shisler [the appellant], of Fort Dodge, Iowa, who was formerly known as Nellie Hower, to certain property in Fort Dodge, Iowa, located near the intersection of First Avenue, South, and Twelfth Street, in which property I have reserved a life estate; and it is not my intention, desire, or will to make any other or further provision of any kind for the said Nellie Shisler [the appellant], formerly Nellie Hower. And I hereby declare that I am in no way indebted to her or to her husband upon any claim for wages or services of any kind or character."

It was the belief of the testator that the property last named was worth $20,000. As before stated, a similar amount was given to the other foster child, Elizabeth Allen, through the will. The testator believed she was providing equally for these children. This was done for Elizabeth Allen through the will, and for appellant by means of the deed named in the testamentary document. When the will was offered for probate, appellant made objections to its admission thereto, on the ground that Mrs. Hower did not have mental capacity to make the same, and that it was procured by fraud, duress, and undue influence. Such exceptions were filed February 16, 1925. In presenting those objections, appellant designated herself as a daughter "by contract of adoption." Thereupon, the court required her to set forth "her contract of adoption." Complying with this judicial order, appellant for the first time on July 1, 1925, offered and set out the contract of indenture before mentioned, wherein the New York Foundling Hospital is one party, and Mrs. Hower purports to be the other. Afterwards, the present proceedings were commenced.

Was the district court right in denying appellant the specific performance of that contract? We think so.

I. Specific performance, generally speaking, is not a matter of right, but rather of sound judicial discretion. *New York Brokerage Co. v. Wharton*, 143 Iowa 61; *In re Estate of Creger*, 198 Iowa 833; *Braig v. Frye*, 199 Iowa 184. Right thereto depends upon elements, conditions, and incidents which equity regards as essential to the administration of all its peculiar modes of relief. *Mitchell v. Mutch*, 180 Iowa 1281.

However, the granting of such redress is not "a mere matter of caprice on the part of a chancellor." *Cohen Bros. I. & M. Co. v. Shackelford Brick Co.*, 197 Iowa 674. Nor is it "a mere matter of grace." Therefore, in a proper case it is not to be denied unless some good reason is shown for so doing. *Kurtz v. Gramenz*, 198 Iowa 222.

Nevertheless, there can be no specific performance unless there is first established a contract, duly signed and delivered. That is axiomatic.

II. Does the record here disclose such an agreement? To establish this, the burden was upon appellant. For appellees, in accordance with Section 11219 of the 1924 Code, denied under oath the genuineness of Catherine Hower's signature to the supposed indenture with the New York Foundling Hospital. Hence, her signature "shall not be deemed genuine or admitted." Section 11219, supra; *Farmers & Traders State Bank v. First Nat. Bank*, 201 Iowa 73. See, also, *Doty v. Braska*, 151 Iowa 23.

III. Support for appellant's proof at this juncture is confined very largely to her own testimony and that of Clara Agnes Gleason Kelley. Appellees object to appellant's testifying, for the reason that she thereby includes within her declarations so made, a communication with a person since deceased; while it appears to be the theory of appellant that the indenture agreement was between her foster mother and the New York Foundling Hospital, and therefore the conversations which she relates do not refer to transactions between her and the foster mother. Because of the conclusion reached by us upon the entire record, we assume, without deciding, the admissibility of the appellant's statements.

Proceeding, then, upon this assumption, it is found that the record in this regard reveals the following assertions made by appellant and Mrs. Kelley. Appellant testified:

"At the time I refer to, I came in from work. There was

no one at the house except myself, my mother, and Mr. McFeely. I recall Mr. McFeely, returning to the house subsequent to that time. Clara Gleason was there at that time, and Mr. McFeely and mother and I. It was around eight o'clock in the evening. The conference took place in the dining room. I heard a conversation between my mother and Mr. McFeely and Miss Gleason, in which I took no part, and in which Mr. McFeely asked mother if she would sign. He took some papers out of his pocket,— three of them,—and laid them on the table. Mrs. Hower was at the table, and Miss Gleason was sitting right there, too, and so was Mr. McFeely, and I was sitting there also. * * *. [Mr. McFeely] asked Clara and mother—I was there, and she read them to her,—that's all I remember. * * * I was where I could hear her read them. I knew at the time what the papers were. * * * After Miss Gleason read the papers, Mr. McFeely was talking to mother, and he asked mother if that was the way she wanted it, and she said she was satisfied, and then the papers were signed. Clara Gleason wrote my mother's name on the papers, and mother made the cross between the name, 'Catherine Hower.' After the papers were signed, Mr. McFeely asked mother if she was satisfied with them, and she said she was. She said she wanted her attorney to read these papers, and then Mr. McFeely left them with mother. Mrs. Hower said to Mr. McFeely that she wanted Mr. Mike Healy to examine the papers. * * * Q. Did you see your mother affix her signature to the papers before Mr. McFeely left there? A. Yes, sir, I did. * * * At Mr. Healy's office, he was sitting with his back towards the window, and had blue glasses on. Mother was right next to the desk, and I sat by the door, right inside as you come in. At that time, I heard a conversation between my mother and Mr. Healy * * *. Mother handed Mr. Healy the papers, and he looked them over, and he said to mother, 'They are all right.' "

Clara Agnes Gleason Kelley also said:

"I live at 1534 East 65th Place, Chicago, Illinois, and have lived here since 1918. I am employed as a stenographer by John Clay & Company, a live stock commission firm here in Chicago. * * * I resided at Fort Dodge, Iowa, from February, 1912, until October of the same year. * * * I was living in the Catherine Hower home all of the month of May, 1912. * * *

Mrs. Hower did not read the English language. · I had occasion to read to her and to write for her. In the month of May, 1912, Mrs. Hower requested me to read an adoption contract, and I read that contract to her. [Exhibit "A" is the contract]. * * * Nellie Hower was present, and I, and my impression is, a representative from the New York Foundling Hospital [and Mrs. Hower]. * * * Mrs. Hower stated, inasmuch as she had taken care of this child since the age of three years, educated her, and took proper care of her, she felt that the child should be considered as a member of the family, and should participate in any means which should be hers after Mrs. Hower's death. Q. And when you read this indenture over, did you read it out loud? A. Yes, sir. Q. At whose request did you read it? A. At Mrs. Hower's request. * * * Mrs. Hower said she was glad the affair was settled, and she had always felt that she should do this much for Nellie Hower. * * * The name Clara Agnes Gleason which appears on the paper marked 'Exhibit A,' is my signature. I placed it there in May, 1912, at the residence of Mrs. Hower, in Fort Dodge, Iowa. The name 'Catherine Hower' is in my handwriting. I signed Catherine Hower's name to this contract, at her request. [There were three copies.] * * * After these three * * * copies of the contract, Exhibit A, were signed in her home, they were taken to the office of Mr. Healy, a lawyer, in Fort Dodge; and after he read them over, he gave the copies back, and one copy was mailed to the New York Foundling Hospital, one was given to Mrs. Hower, and one was given to Nellie Hower."

The witnesses Mrs. E. F. Christian and R. K. Shisler, appellant's husband, add some support to this.

Opposed to the testimony of these two women and the other witnesses named are the statements of Mr. McFeely, Mr. Healy, Elizabeth Allen, the Foundling Hospital officials, and others. Manifestly, according to the statements of those in charge of the New York Hospital, two, and not three, indentures were mailed to Mrs. Hower, at Fort Dodge. Mr. McFeely did not bring those instruments there, as appellant and Mrs. Kelley said, nor was he present in the Hower home, or at any other place, according to his testimony, when any such document was signed. He says that he never knew of its execution. Apparently he was not even in Fort Dodge at the time.

M. F. Healy, a veteran attorney of that city, had been the counselor and business adviser of Catherine Hower for many, many years. When upon the witness stand, he said Mrs. Hower, Nellie, or Mrs. Kelley never at any time, collectively or individually, appeared in his office with, or presented to him at any other place, the contract of indenture aforesaid. Healy stated that no such conference. was ever held. More than this, Mr. Healy at that time did not wear glasses of the kind described, because his eyesight had. not yet become defective. Contradiction of appellant and Mrs. Kelley at this point is sharp. Likewise, dispute arises between appellant and Mrs. Kelley on the one hand, and on the other, the hospital officials, concerning the return of the contract to the hospital at New York City. Those officials have no record of ever receiving it, and they are positive that they did not. Significant, too, is the positive assertion made by Elizabeth Allen to the effect that the alleged indenture agreement was not signed by Mrs. Hower or witnessed by Mrs. Kelley as late as the year 1921. Elizabeth Allen was in the Hower home during May, 1921, when appellant and her husband were there. A quarrel took place between Mr. Shisler and appellant, and became so serious that he went upstairs, obtained a bundle of papers, and threw them at appellant. Then Elizabeth Allen took those papers and read one of them to her mother. It was the New York Hospital indenture, known in the record as "Exhibit A." At that time, this witness, Elizabeth Allen, as before related, says the document was executed by the New York Foundling Home, but was not signed by Mrs. Hower, nor did the name of the witness Clara Agnes Gleason appear thereon. That was approximately nine years after the purported execution.

Furthermore, there are facts and circumstances which also rebut the testimony of. appellant and Mrs. Kelley. They are:

1. If it is true that McFeely brought those papers for execution, why would he leave the Hower home in Fort Dodge, knowing that Mrs. Hower was not satisfied until her attorney had approved the documents? Why did McFeely not wait to learn the conclusion reached by this attorney, and why did he not take the executed document with him, and return it to the New York Hospital, if, in fact, it was brought by him?

2. If Mr. McFeely delivered those indentures to the Hower

home, why was it necessary for appellant to write to New York, in order that she might learn the validity of the execution, in view of the fact that her foster father was dead, and only the mother remained to sign? Why could she not have ascertained this by asking Mr. McFeely? Or why could she and her mother not have consulted Mr. Healy before the execution, as well as thereafter, in order to be advised concerning the sufficiency of the instrument?

3. Doubt appears as to whether or not these contracts were ever in the possession of Mrs. Hower. Evidently they were at all times in the care and custody of appellant. About two years before Mrs. Hower's death, D. J. Coughlin was called to her home. He says:

"I went up there * * * and found Mrs. Hower and Mrs. Allen somewhat excited because, they said, Nellie claimed that she had some papers that were not like Lizzie's [Elizabeth Allen's] papers. * * * Lizzie's [Elizabeth Allen's] adoption papers were brought out,—they brought them to me to see. I think I read it through, but Nellie's was not obtainable. That might have been in 1920, 1921, or 1922."

4. During the many conferences between Mrs. Hower and her attorney, Mr. Healy, she always said, when the matter was discussed, that she had no contract with appellant, and that she was not legally obligated to give appellant anything. Like statements were made by her to Mr. D. J. Coughlin, cashier of the Iowa Savings Bank, who was also a business and confidential adviser. Other business men in the city of Fort Dodge advised with Mrs. Hower concerning her affairs, and talked with her in confidence regarding the foster children; yet at no time did she mention to them that she ever executed the alleged indenture in behalf of appellant, but rather, denial thereof was made, whenever the question was discussed.

5. Why did appellant not set forth her contract of inheritance when she first attacked the will, instead of basing her exceptions upon mental incompetence, undue influence, etc.?

Attempt has not been made here to set forth all the inconsistencies and inaccuracies of statements in this regard. Rather, only an outline thereof has been presented.

Burdened with the duty of proving the genuineness of Mrs.

Hower's signature, appellant has failed to furnish such necessary substantiation as will permit recovery here. Confronting her are all the contradictions and inconsistencies above set forth. Resultantly, she has not supplied in this record such essential and sufficient support for her cause as to entitle her to specific performance of the alleged indenture.

IV. Equally unsatisfactory is appellant's effort to show delivery, even if there had been a signing of the agreement. Very scant evidence, if any, appears that a document of this kind was ever left with Mrs. Hower after her signature was placed thereon. According to appellant's version of the transaction, she kept these instruments in her own possession, sometimes in a safe, then again in her personal custody. Also, it is difficult to find substantiation for the fact that there was ever any delivery of the writing to the New York Children's Hospital. That institution emphatically denies ever having received it. Concerning the mailing of the indenture to that children's home, there is much uncertainty. The exact address is not shown, nor does it appear that there were stamps on the envelope, if one was used.

Vagueness at all places is present concerning this part of the transaction. Here, as before, appellant has failed to meet the burden of proof cast upon her.

V. Other and different defenses are advanced by appellees, to defeat appellant's recovery. Among them are lack of consideration and the unconscionableness of the alleged agreement. But because of the positions we have taken in the matters discussed, it is not necessary to extend this opinion further; and therefore no further consideration is given to these undecided propositions.

Consequently, after fully and carefully considering the entire record, it is our conviction that Mrs. Hower sought, as best she could, to treat Elizabeth Allen and appellant exactly alike in the matter of property distribution. Both girls, besides the $20,000 considerations, obtained certain minor benefits. All in all, these smaller gifts and benefactions are approximately equal. Not being burdened with any legal duty to give appellant anything at all, Mrs. Hower then had a right to use her own discretion in making the will, and this foster daughter has, of course, therefore, no just right to complain.

318

.Wherefore, the judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed*.

ALBERT, C. J., and EVANS, STEVENS, and WAGNER, JJ., concur.